MONCUR®, J.,
delivered the opinion of the court.
The court is of opinion, without deciding any other question in this cause, that laches and lapse of time afford a sufficient ground for affirming the decree of the court below, dismissing the plaintiff’s bill. It is an inherent doctrine of courts of equity to refuse to interfere where there has been gross *270 laches in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse rights. 2 Story’s EJq. 1520. As was said by Lord Camden, in Smith v. Clay, Ambler R. 645, “a court of equity, which is never active in relief against conscience, *or public convenience, has always refused its aid to stale demands, where the party has slept upon his right, and acquiesced for a great length of time. Nothing can call forth this court into activity, but conscience, good faith, and reasonable diligence. Where these are wanting the court is passive and does nothing. Laches and neglect are always discountenanced.”
This doctrine of courts of equity has been always recognized and acted on, and these observations of Lord Camden have been often repeated and approved by the courts of England and this country. Id. note 3, and cases cited. Wagner &c. v. Baird &c., 7 How. U. S. R. 234, 258. This is emphatically the case in our own state, in which there are many decisions to that effect; of which Carr’s adm’r &c. v. Chapman’s legatees, 5 Leigh 104, 164, 171, is the leading one. See also Hayes v. Goode, 7 Id. 452; Atkinson v. Robinson, 9 Id. 393; and Caruther’s adm’rs v. The Trustees of Lexington, 12 Id. 610.
On the 7th of April, 1838, an order was made by the executive department -of Virginia in these words:
“The heirs of George Doggett are allowed land bounty for his services as a carpenter in the state navy for three years. The register will issue a warrant accordingly, if not heretofore drawn.”
Under this order it was the duty of the register of the land office to issue a warrant for the proper quantity of land to such person or persons as might claim, and, to his satisfaction, prove themselves to be the heirs of the George Doggett referred to in the order.
Accordingly on the 30th day of July, 1838, a few months after the order was made, William Helm, claiming to be the agent and assignee in part of William Chitwood, and that said Chitwood was the sole heir of the said George Doggett, and having exhibited satisfactory evidence to that effect to the register, obtained from him two land ^warrants, one to said Helm and the other to said Chitwood, each for 1,333%” acres of land, making together 2,666% acres, the quantity to which the heirs of George Doggett were considered to be entitled under the order, and forthwith forwarded the said warrants to the general land office at Washington, to be exchanged for scrip.
But it turned out that there was another class of persons claiming to be the heirs of the George Doggett referred to in the executive order, who had employed A. M. Green as their agent, who had for years been pressing the claim for bounty land before the executive, and upon evidence furnished by whom, it seems, the claim was at length allowed. These alleged heirs, it seems, had not matured to their satisfaction the evidence of their heirship to be exhibited before the register, but were engaged in doing so, when the competing claim of Chitwood was presented to and allowed by him, without knowing, or remembering, that the class of persons represented by Green claimed to be entitled under the said order. The latter persons, by their agent Green, proceeded to mature their evidence of heir-ship, and in November of the same' year 1838 applied to the register, Selden, to correct the supposed error, by recalling the warrants he had issued, and issuing others in their place to the said persons as the parties really entitled. But the register declined doing so, upon the ground that in his opinion he had no leg'al right to recall the warrants, then out of the state and filed in another department. He said, however, that should the warrants be returned, he would carefully examine all the proofs connected with them, and do impartial justice to the parties, as far as he could. Green seems then to have sent the papers supporting the claim of his principals to the commissioner of the general land office, for the purpose of proving that the warrants had been issued erroneously, and having the supposed error corrected. The '^commissioners, in a letter dated October 5th 1839, to Stafford H. Parker, then register of the land office at Richmond, enclosed the said papers ; saying that if, on examination thereof, connected with the evidence already in the register’s possession, and upon which the warrants were granted, the latter should be satisfied that the said warrants issued erroneously, they should, at his request, be returned; and that he had so advised the said Helm, by whom the warrants had been filed in his *271 office. The register declined recalling the warrants for the purpose of cancelling them and issuing others to the adverse claimants, believing that he had no authority to do so.
Shortly thereafter, and during the same month, to wit, on the 24th of October, 1839, a suit in chancery, called in the record the ‘‘Richmond suit,” was instituted in the Circuit Superior court of law and chancery for the county of Henrico and city of Richmond, in the name of the heirs of the George Doggett, whose heirs were represented by Green, against the adverse claimants Helm and Chitwood, to which suit the register, Parker, was also made a defendant; the object of which suit was to have the warrants which had been issued recalled and cancelled, and new warrants issued to the plaintiffs as the parties entitled thereto. The defendants thereafter filed their answers, and on the 19th of June, 1843, an issue was ordered to be tried at the bar of the Circuit court of Lancaster, to ascertain —first, whether one or two persons of the name of George Doggett served in the revolutionary war. Secondly. If there were two, whether the plaintiffs and the defendant Chitwood were their heirs, respectively. And thirdly. If there was but one, whether the plaintiffs or the defendant Chitwood are his' true heirs. That issue was not tried until the 1st of April, 1848, when a verdict was found, first, that there were two George Doggetts of the county of Lancaster, employed in the naval state ^service in the revolutionary war. Secondly. That said Chitwood is the heir of one of them; that is, the one who shipped as carpenter on board the Tartar; and, there being no evidence before the jury but what was contained in the record, they referred the question to the court upon that evidence, whether the plaintiffs were the heirs of the other George Doggett. The last part of the verdict of course amounted to nothing. Nothing further seems to have been done in the case until June 28th, 1848, when the cause came on further and finally to be heard in the Richmond court, on the papers formerly read, and the verdict certified from the Lancaster court; and the bill was dismissed with costs.
On the 31st of August, 1852, an act of congress was approved, making further provisions for the satisfaction of Virginia land warrants; the provision made by previous acts having long before been exhausted. This act authorised the secretary of the interior to issue land scrip in favor of persons then entitled under unsatisfied Virginia land warrants, fairly and justly issued in pursuance of the laws of said commonwealth, for military services rendered in the war of the revolution.
On the 30th of April, 1853, Thomas Green, brother of A. M. Green, and counsel, it seems, of the parties of whom said A. M. Green was agent as aforesaid, addressed and sent a long letter to the commissioner of the general land office, requesting him not to issue scrip to Helm on the warrants which had been issued to him and Chit-wood, but to retain them for the right heirs; and maintaining, on grounds and for reasons fully set forth, that the parties represented by him, and not Chitwood, were the heirs of the George Doggett, the claim of whose heirs had been allowed by the executive of Virginia aforesaid. In that letter the Richmond suit was referred to, and it was argued that the decree in that suit interposed no bar to the claim *of the plaintiffs, and at all events that the commissioner was not bound unless he thought the warrants were “fairly and justly issued,” according to the terms of the act of congress. Similar letters were written by said Thomas Green to the said commissioner, and to the secretary of the interior, bearing date, respectively, on the 19th of May, 1854, and the 21st of June, 14th and 21st of July, and 12th of November, 1855. In the letter of the 21st of July, 1855, the writer mentions, for the first time, that William Doggett, in whose name, as one of the plaintiffs, the Richmond suit was brought and prosecuted to a decree, was dead at the time of the institution of the suit, which fact, he contends, renders the proceedings in the suit null and void. “It is fortunate,” he says, “thedis-covery is made in time to prevent injustice by the technical trammels of the law, if indeed the act of congress did not already authorize you to review the case, and to seek out the real proprietors, independent of any pre-existent state trammels:” and he requests a few days delay in order to obtain conclusive proof of the death of William Doggett long before the institution of the suit in his name, if the secretary should regard such proof as material to a fair and just decision of the case. In the letter of the 12th of November, 1855, the writer encloses a copy of William Doggett’s will, admitted to probate on the 18th of February, 1839, and the affidavit of Murdaugh in regard to the, death and heirs of William Doggett.
The question on the conflicting claims for land scrip preferred in the name of “George Doggett,” having been referred by the secretary of the interior to the attorney general, the latter officer gave an opinion on the 10th of March, 1856, in which, after stating and commenting on the conflicting claims, he thus concludes: “I think the true course in the case, if you are not satisfied as to the *'fairness, justice and legality of the issue of the warrants, is to refuse to grant scrip to either party. Green’s Doggett has no warrant to surrender, and cannot demand scrip in lieu of a mere undetermined claim of and right to a warrant. Helm’s Doggett is not entitled, unless he can satisfy you that the warrants were issued to him fairly and justly and in pursuance of law. If he does not, then it would seem that neither party has made out a case, requiring or justifying the affirmation, or any other decisive action of the department. ’ ’
In a letter from the commissioner of the *272 general land office to Helm, dated March 24th, 1856, enclosing a copy of the above mentioned opinion, the commissioner says: “In view of the proof presented by the party representing the‘Lancaster Doggett,’ showing that one of the heirs specified in the bill was not in life at the time it was filed, and that his representatives therefore could not be affected by the decision rendered in the case; and furthermore, that as that decision does not appear to decide the question as to whether the warrants were allowed and issued pursuant to the laws of the commonwealth, I am of the opinion that no further action should be taken by this office in the premises, until it is shown that the parties interested have exhausted their legal remedies before the courts of Virginia.”
The controversy before the land office department at Washintgon being thus brought to a stand still, and the conclusion to which that department arrived on the case, as it then stood, inviting further litigation in the courts of Virginia, as a necessary means to the final settlement of the matter, a suit in chancery was brought in the Circuit court of Fauquier county, called in the record the “Fauquier suit,” on the 11th of September, 1856, in the name of William H. Doggett, and the other heirs of William Doggett, the dead plaintiff in the “Richmond *suit,” against Helm, ' Chitwood, and other defendants; the plaintiffs praying in their bill for a decree that Chitwood and Helm had no right to any portion of the said warrants; that said Helm should deliver them up; that the plaintiffs might receive their one-fourth share thereof; and for general relief. The only answer filed to that bill was filed by Helm in February, 1857; and on the 10th of September, 1858, the cause came on to be heard, and a decree was rendered dismissing the bill, for reasons set forth in the decree. From that decree this appeal was taken.
There can be no doubt but that all the plaintiffs in the Richmond suit, except William Doggett, are bound by the decree which was rendered therein. Ñor can there be any doubt but that William ' Doggett’s heirs are bound thereby, in a court of equity at least, if the suit was prosecuted in William Doggett’s name with their knowledge and acquiescence, they intending to claim the benefit of the decree which might be rendered therein, should it be in- the plaintiff’s favor.
The circumstances of the case, as disclosed by the record, tend strongly to show, that the heirs of William Doggett had knowledge of the pendency of the suit shortly after its institution, and acquiesced in its prosecution for their benefit. They certainly had knowledge of the existence of the claim before the suit was instituted. They knew that their father had employed Felix Richards to prosecute the claim in his behalf; and one of them, William H. Doggett, wrote to Richards on the 19th of June, 1839, informing him that his father was then dead. In fact, his father died in the preceding January, and the suit was brought in the succeeding October. Some time after the death of William Doggett, his son William H. Doggett spoke to Mr. Mur-daugh, a lawyer, in relation to the claim, and brought him some letters, *purporting to have been written by Felix Richards, and directed to William Doggett or William H. Doggett. The parties, William H. Doggett and his sisters, were - anxious to employ Mr. Murdaugh to attend to the claim, but he declined, as it was under the care and management of Mr. Richards. While William Doggett had employed Felix Richards, the ,other heirs of the George Doggett, under whom William Doggett claimed, had employed A. M. Green to prosecute their claim. Thus all that class of claimants was represented by Green and Richards, who, as might be expected (having a common object in view), and as the record shows, communicated with each other, and acted in concert in the prosecution of the claim. Thomas Green, in his letter to the secretary of the interior of the 21st July, 1855, which is filed as an exhibit with the bill in the Fauquier suit, in accounting for the Richmond suit being brought in the name of William Doggett instead of his heirs, says, that Felix Richards left the conduct of the controversy to A. M. Green, and as he kept up no correspondence with the William Doggett branch of the family, he was not aware of the death of William Doggett, and did not communicate the fact to Mr. Patton, who prepared the bill. It is difficult to believe that the heirs of William Doggett remained in ignorance of the existence of the Richmond suit, from the time of its institution in October, 1839, to the time of the final decree in June, 1848, nearly nine years. They probably knew of it during the • whole, or greater part, of that period. Their agent Richards must have known of it, and no doubt communicated the fact to them. But notice to the agent was notice to the principals. In the bill in the Fau-quier suit, not one word is said about the ignorance of the plaintiffs of the Richmond suit, at the time of its institution or during its pendency. So important a fact, if it had been true, *would hardly have been omitted in that bill. The Richmond suit was negligently prosecuted. It was brought in 1839. The issue was not ordered until 1843, and not tried until 1848. The suit was pending nearly nine years, when due diligence would have brought it to a conclusion in one or two. The nature of the case required the utmost diligence. The doctrines of a court of equity require, that a suit shall not only be brought in due time, but prosecuted with due diligence.
But -whether the heirs of William Doggett had notice of the pendency of the Richmond suit or not, or whatever may be the effect upon their rights, of that suit, or the decree rendered therein, laches and lapse of time certainly interposed a bar to their recovery in the Fauquier suit. The controversy *273 about these warrants arose immediately after they were issued, in July 1838. They were issued to one of two sets of conflicting-claimants ; and if a resort to a court of equity by the other set was necessary to determine the controversy, it was all-important that such resort should be had as soon as possible. The evidence called for by the nature of the controversy was, of the identity of a man who died at least as far back as 1785, fifty-three years before the warrants were issued. It appeared, strangely enough, that there had been two George Doggetts of Lancaster, who had been carpenters in the state navy during the revolution, while land bounty had been allowed to the heirs of only one of them. But which one, was the question in controversy; and a difficult question it certainly was. It would have been difficult, if not impossible, for a court to have decided that question, even if the suit had been brought immediately after the claim was allowed by the executive. The lapse of time since the death of the party whose identity was in question was so great as to render it almost impossible to adduce that kind of evidence *which a court must require as the foundation of its decrees. The law has prescribed rules of evidence for the government of the courts which must remain inflexible, and cannot be moulded or changed to suit particular cases. The same rules of evidence must, therefore, be applied by courts to controversies about claims to bounty land for military service as to all other controversies. The legislature, in view of the difficulty of proving such claims by legal evidence after a great lapse of time, by an act passed February 28, 1816, authorized the governor and council to allow and certify them upon satisfactory evidence. 2 Rev. Co. 1819, p. 480. And the governor and council have accordingly been in the habit, and properly so, of allowing such claims upon ex parte affidavits, certificates of. courts and other like evidence, which, though not legal in a court of law or equity was yet the best of which the nature of the case would admit, and satisfied them that the claims were just. But the case is different when a controversy about these claims comes before a court. Then the fixed legal rules of evidence must govern it.
But it would have been difficult, and almost impossible, for a court to have settled this controversy when it first arose; that difficulty was greatly increased by lapse of time afterwards, and the claimants must have known that such would be the necessary effect of delay in bringing their suit. They ought, therefore, to have brought it immediately. Instead of doing so, the heirs of William Doggett delayed in bringing their suit from July, 1839, to September, 18561 — a period of more than seventeen years. This was an inexcusable delay, and no attempt has been made to assign for it any adequate excuse. When that suit was brought it was certainly impossible, if not before, to settle the controversy according to the legal rules of evidence. And accordingly, when the cause came on *to be heard though the amplest opportunity had been afforded the parties to prepare the case for trial, the evidence mainly consisted of copies of the ex parte affidavits and certificates of courts which had been exhibited by the parties, in support of their respective pretensions, before the register of the land office in Richmond and the commissioner of the general land office in Washington. Such evidence, however satisfactory it might be to those officers, and properly so, afforded no sufficient foundation for a judicial decree upon the merits of the controversy, and the only decree which the court could properly make was to dismiss the bill. There was not sufficient ground for ordering an issue; and the fruitless attempt to ascertain the facts in controversy by the issue which was ordered in the Richmond suit, and which was tried in 1848 in the county of Lancaster, where both of the George Doggetts are said to have resided, shows how vain such an attempt would have been in 1858.
It is said, in excuse of the delay in bringing the suit, that until the act of Congress of August, 1852, was passed, no provision existed for the satisfaction of the land warrants in question, and it was uncertain when such provision would be made, or whether it ever would be made; and, therefore, that until then, the warrants were of little or no value. If they were of no value, or of so little value as not to be worth suing for, then the plaintiffs, by not bringing their suit, in effect abandoned their claim. But if they were worth suing for, and intended to be sued for, the suit, to be available, if it could be made available at all, ought to have been brought at once. They had been issued to the adverse claimants, whose right was maturing, as the intrinsic difficulties of the controversy were increasing by lapse of time.
- The application to this case of the doctrine of courts of equity referred to in the first part of this opinion, is *plain and palpable, and the decree must, therefore, be affirmed on the ground of laches and lapse of time. But w’hile the courts cannot, for reasons before stated, decide the controversy between the conflicting complainants, the proper executive officers in Richmond and Washington may not have the same difficulty, and may’ be able to decide it as justice may seem to them to require, upon evidence long since laid before them, which they’ may’ have the right to read under the discretionary power conferred upon them in such cases, but which the courts cannot. That evidence was taken shortly before or after the time when the claim of George Doggett’s heirs was allowed by the executive of Virginia, and is no doubt the best evidence, and indeed all the evidence of which the nature of the case will now admit. But whether the controversy can be settled in that way or not, is a question with which we have nothing to do, and it is only for us to say *274 that the court cannot settle it or do otherwise than affirm the decree dismissing the bill; which we now do.
Decree affirmed. But this affirmance is to be without prejudice to the claims of the respective parties to the warrants in controversy, before the proper executive officers in Richmond and Washington, and to any right of these officers or any of them to decide upon their conflicting claims, as justice may seem to require, upon such evidence before them,' as they may deem to be satisfactory.